# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

SALVADORE GARCIA,

    Petitioner,

v.

BRIAN WILLIAMS, SR., et al.,

    Respondents,

Case No. 2:18-cv-01324-APG-VCF

**ORDER**

[ECF No. 55]

The respondents have moved to dismiss all of the claims in the amended petition for untimeliness, lack of exhaustion, procedural default or non-cognizability. ECF No. 55. No opposition to the motion has been filed.

## *Governing Standard*

Under Local Rule LR 7-2(d), "[t]he failure of an opposing party to file points and authorities in response to any motion [with exceptions not applicable here] shall constitute a consent to the granting of the motion." When an opposing party receives notice and is given sufficient time to respond to a motion to dismiss, a district court does not abuse its discretion in granting the motion based on failure to comply with a local rule. *See Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995).

## *Discussion*

It is notable that petitioner Salvadore Garcia's counsel began by vigorously presenting extensive legal argument addressing potential defenses in her initial filings for Garcia. I admonished her twice that the initial counseled pleading needed to present instead a counseled amended petition clearly and specifically asserting all of Garcia's claims for relief rather than legal argument in response to anticipated potential defenses. *See* ECF Nos. 11, 13 (stricken), 36,

40, 48. Counsel further previously filed an opposition to the first motion to dismiss (which I denied without prejudice given the need for Garcia to first file a proper counseled amended petition). ECF Nos. 14, 22, 34, 36. After Garcia filed a somewhat more proper counseled amended petition and the respondents filed the current motion to dismiss, Garcia's counsel took no action whatsoever. It is difficult to conceive how counsel could construe the situation as not requiring a timely response to the current motion to dismiss in order to avoid dismissal under the local rule. *See, e.g.,* ECF No. 36, at 3; ECF No. 48, at 7. Garcia appears to have potential arguments in opposition to the current motion to dismiss, but his appointed counsel has failed to present them in an opposition within the time allowed by the local rule. There are at least debatable issues as to whether the amended petition is subject to dismissal with prejudice, in whole or in part, for untimeliness or procedural default based on an attempted showing of actual innocence.

Prior to this point, Garcia has not presented a potentially viable argument challenging either the putative untimeliness of the amended petition on its face or the facial application of state procedural bars raised by the respondents.[1] However, Garcia has sought to overcome such

---

[1] The facial application of the one-year federal limitation period in 28 U.S.C. § 2244(d) to this case is straightforward. Under § 2244(d)(1)(A), absent a basis for tolling or delayed accrual, the one-year limitation period starts running from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." On direct review, the state supreme court issued its order of affirmance on October 11, 2007. Under established law, absent tolling or delayed accrual, the federal limitation period started running after the time to seek *certiorari* review expired 90 days later, on January 9, 2008, concluding direct review for purposes of § 2244(d)(1)(A). *See, e.g., Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). Absent tolling or delayed accrual, the limitation period thus would expire one year later, on January 9, 2009. Garcia did not constructively file the federal petition in this matter until about July 16, 2018, when he dispatched the petition for filing. The original petition therefore was untimely on its face by nearly a decade.

Garcia's counsel has urged that the limitation period did not start running until after the proceedings on his untimely January 29, 2016 state postconviction petition were concluded in the state appellate courts in September 2017, because it was Garcia's "last action" in the state courts.

2

untimeliness or procedural default by a showing of actual innocence under the standard enunciated in *Schlup v. Delo*, 513 U.S. 298 (1995).[2]

---

ECF No. 34, at 3. This argument, presented with no supporting case citation, is incorrect and flies in the face of both the plain language of the statute and more than two decades of Ninth Circuit jurisprudence applying the statute.

     Garcia's counsel further made a passing reference suggesting that direct appeal counsel did not inform Garcia when the appeal was concluded or tell him how much time he had to file a federal petition. No supporting declaration or affidavit was presented with specifics, and the record cite provided did not cite to relevant evidence. ECF No. 34 at 7 & n.17. A failure of state direct appeal counsel to inform an inmate regarding the calculation of the federal limitation period does not provide a basis for equitable tolling of the federal limitation period. A failure to inform the inmate that the direct appeal has concluded potentially can provide such a basis, but not as a viable explanation for a failure to file a federal petition for nearly a decade, particularly with no supporting specifics.

[2] A showing of actual innocence satisfying the *Schlup* standard can overcome: (a) the otherwise untimeliness of a federal habeas petition or claim under the one-year limitation period in 28 U.S.C. § 2244(d); and (b) the otherwise procedural default of a federal habeas claim based upon the application of state procedural bars. *See, e.g., McQuiggin v. Perkins*, 569 U.S. 383 (2013) (federal limitation period); *Schlup, supra* (procedural default).

     In order to satisfy the *Schlup* actual innocence gateway, a petitioner must come forward with new reliable evidence that was not presented at the trial that, together with the evidence adduced at trial, demonstrates that it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. *E.g., Schlup*, 513 U.S. at 324-27. "This exacting standard 'permits review only in the 'extraordinary' case, but it 'does not require absolute certainty about the petitioner's guilt or innocence.'" *E.g., Lee v. Lampert*, 653 F.3d 929, 938 (9th Cir. 2011) (*en banc*) (quoting prior authority). If the evidence presented on post-conviction review casts doubt on the conviction by undercutting the reliability of the proof of guilt, but not by affirmatively proving innocence, that can be enough to pass through the *Schlup* gateway to allow consideration of otherwise barred claims. *Id.*

     Under current Ninth Circuit precedent, the evidence need not be newly discovered, but it must be "newly presented," *i.e.*, presented after the trial. *See Griffin v. Johnson*, 350 F.3d 956, 961-63 (9th Cir. 2003); *but cf. Pratt v. Filson*, 2017 WL 3327889, at *1 (9th Cir. Aug. 4, 2017) (questioning whether this holding in *Griffin* must be reconsidered). The federal habeas court considers all the evidence, old and new, inculpatory and exculpatory, whether admissible at trial or not. *Lee*, 653 F.3d at 938. Newly presented evidence may call into question the credibility of trial witnesses, potentially requiring credibility assessments on federal habeas review. *Schlup*, 513 U.S. at 330; *Stewart v. Cate*, 757 F.3d 929, 941 (9th Cir. 2014). On a complete record, the court makes a probabilistic determination about what reasonable, properly instructed jurors would do. *Lee*, 653 F.3d at 938. In this regard, "actual innocence" means actual factual

As backdrop, Garcia was charged with, among other things, the attempted murder of Jonathan Harper with a handgun while Harper was at a relatively small gathering or party at Garcia's residence. In some manner, Harper sustained a gunshot wound to the head while seated at Garcia's kitchen table.

The trajectory of the .38 caliber bullet within Harper's skull essentially was not disputed at trial. According to the trial evidence,[3] the bullet entered Harper's skull above and behind his left ear. The bullet then traveled in a trajectory sharply upward (at least solely within the context of the skull itself, with "upward" meaning "superior" in anatomical terminology) within the skull before exiting toward the "vertex," or top, of the skull on the left side. The bullet produced a fairly large exit wound toward the top of the skull, blowing out portions of bone and brain matter. There was no testimony that the bullet bounced off bones within the body or that there were any variances in the trajectory of the bullet after it entered Harper's skull. Rather, the relevant testimony tended to establish that the bullet followed a straight trajectory within Harper's skull from the entry wound behind and above his left ear straight through to the larger exit wound toward the top left of his skull. ECF No. 52-6, at 38-39, 41-42, 43-44. In contrast, where Garcia was and what he was doing, what Harper was doing, and how Harper's head thus likely was oriented in space at the time of the gunshot, all were contested issues at trial.

---

innocence, not mere legal insufficiency. *See, e.g., Sawyer v. Whitley*, 505 U.S. 333, 339 (1992) (later superseded by statute in other respects).

[3] In summarizing trial and other evidence and argument, I make no findings of fact or credibility determinations. I merely summarize the evidence and argument as backdrop to this discussion. The omission, for the sake of brevity and readability, of repeated phrases such as "certain evidence tended to show that" or "the witness testified that" does not signify that I am making any factual finding or credibility determination. Prefaces of this nature should be read into every statement of historical fact made in this summary. Nor do I summarize all potentially relevant evidence, including contextual evidence.

Under the State's theory of the case, Garcia fired the handgun at the back left side of Harper's head while Garcia was standing to the left and several feet behind Harper while the latter was seated at the kitchen table. Under the State's theory, the bullet traveled along a straight line from Garcia's alleged position straight through Harper's skull, out through the top of his skull, and then more or less in a horizontal trajectory across the room. The State posited that Harper's head and upper body must have been slouched or slumped more forward over the kitchen table for one reason or another at the time of the gunshot, allowing the bullet to travel "upward," *i.e.*, in a superior direction, within Harper's skull while it nonetheless was traveling more horizontally in relation to the room itself. Under the State's theory, the bullet necessarily had to be going in a straight line from Garcia's alleged position behind Harper, through Harper's skull, and then further in a horizontal flight path toward the opposite wall. What the bullet apparently could not be doing consistent with the State's theory of the case was traveling upwards toward the kitchen ceiling. *See* ECF No. 52-7, at 31-32, 39-40, 41-42.

The defense sought to raise a reasonable doubt as to the State's theory of the case by presenting contrary evidence seeking to potentially establish instead that: (a) Garcia had left the kitchen and instead was in another part of the residence at the relevant time; (b) Harper had recently injured his dominant right hand and was himself handling the handgun with his nondominant left hand; and (c) a very intoxicated Harper at the very least accidentally discharged the weapon while awkwardly handling the handgun in his lap with his nondominant left hand.[4] Under the defense theory, the bullet would have traveled straight upward from the

---

[4] There also were references to Harper possibly shooting himself during a game of Russian Roulette, and the State also suggested that that was part of an initial cover story to the police. *See* ECF No. 52-7, at 39. The principal theory advanced by the defense at trial, however, appeared to be that Harper accidentally fired the gun—albeit, as one possible accidental-discharge scenario, perhaps while he was preparing the gun for Russian Roulette. *See id.,* at 37-

5

gun in Harper's lap, through his skull, and then up toward the kitchen ceiling. *See* ECF No. 52-7, at 32-38. It would appear to be not entirely physically impossible for an individual to accidentally shoot themselves behind and above their left ear while awkwardly handling a weapon in their lap with their left hand, particularly with their head canted slightly while also being rotated to the right, such as when looking up and off to the right. *Cf.* ECF No. 52-6, at 44.

Any evidence reliably tending to establish that the bullet traveled upward in the room toward the kitchen ceiling thus would have supported the defense theory of the case and would have contradicted the State's theory, on a central and hotly disputed issue at trial.[5]

In seeking to establish actual innocence under the *Schlup* standard, Garcia has tendered: (1) an affidavit by a posttrial defense investigator attesting that he recovered (a) what in his opinion were bullet fragments that had been embedded in the kitchen ceiling above where Harper was sitting, in locations consistent with the trajectory of a fragmenting bullet travelling upward through Harper's skull into the ceiling, and (b) a dried substance from the kitchen overhead light fixture that appeared to be brain matter or some type of bodily substance; and (2) affidavits by two party guests seeking to establish that Garcia was not in the kitchen at the time of the shooting and that Harper accidentally shot himself. ECF No. 52-36, at 4-18; ECF Nos. 52-37, 52-38.[6]

---

38. The position of the entry wound, behind and above the left ear, was not necessarily consistent with the at least typical positioning of a handgun during Russian Roulette or an otherwise self-inflicted injury. *Cf.* ECF No. 52-6, at 40.

[5] Most certainly, other evidence and inferences both pro and con for the State and for the defense were explored at trial. My discussion here does not seek to exhaustively canvass or summarize the trial evidence and argument but instead focuses on the potential relevance and materiality of the specific evidence tendered previously by Garcia in seeking to overcome state and federal procedural bars via a showing of actual innocence.

[6] While the investigator's report clearly refers to probable "bullet" fragments, petitioner's counsel refers to the fragments instead also as "gun" fragments. *E.g.*, ECF No. 52, at 11. Unless the gun itself exploded and sent shrapnel – "gun fragments" – flying into the surrounding area,

6

I do not suggest that, at least standing alone, affidavits by two more party guests seeking to corroborate the defense version of who was where doing what when the gun was fired will satisfy the *Schlup* standard. The above-cited closing arguments reflect that the defense presented testimony by a total of eight party guests seeking to establish and corroborate the defense version as to what Garcia and Harper were doing when the gun was fired. The details of that testimony by each witness was extensively explored during closing arguments, and the testimony relied upon by the defense ultimately did not persuade the jury. *See* ECF No. 52-7, at 30-32 (State); *id.*, at 32- 34, 38 (defense); *id.*, at 39-41 (rebuttal). Unless there is something markedly different about the testimony of these two posttrial affiants that is not similar to and cumulative of the extensive party guest testimony that the defense presented at trial, it is unclear at present whether

---

the correct terminology would appear to be "bullet" fragments. That is what the investigator asserts that he found, probable bullet fragments.

In prior filings, Garcia has sought an evidentiary hearing for further factual development vis-à-vis the actual innocence issue. If such a request were granted, further factual development potentially might include forensic comparison of the alleged bullet fragments recovered by the posttrial investigator with the bullet fragments recovered from Harper's skull and/or wounds after the incident. *Cf.* ECF No. 52-36, at 6 (the investigator expressed confidence that the two sets of fragments would match exactly in chemical composition).

The investigator also opined that if a standing person shot Harper from the left and hit him behind the left ear, the bullet's trajectory would have been toward his right jawbone or right side of his face. ECF No. 52-36, at 5. The investigator appears to assume, however, that Harper was sitting upright in the chair with his head in standard anatomical position. The State's theory at trial was that Harper's head was not in that position, and that he instead was more slouched or slumped forward. Even assuming *arguendo* that the investigator was a competent witness to opine on this specific point, it does not appear that this particular opinion would go very far in establishing actual innocence under the *Schlup* standard. The underlying point – as to how the bullet could have travelled the trajectory that it did in Harper's skull with Garcia firing the gun from where the State claimed that he did – was explored at trial. In contrast, the presence of bullet fragments in the kitchen ceiling would appear to directly contradict the State's theory of the case.

7

the additional party guest testimony would satisfy the *Schlup* standard.[7] New evidence bearing on the trajectory of the bullet, however, potentially may be a different matter, as the discussion above reflects.

Against that backdrop, I find that the public policy in favor of determining cases on their merits (here the merits of the affirmative defenses raised and potentially also the merits of the underlying claims) outweighs the factors that otherwise might support a dismissal under the local rule. I so find particularly given the strenuous effort previously directed by Garcia in his prior filings to the untimeliness and procedural default issues.[8] Nor are the respondents unduly prejudiced by having to respond to Garcia's potential arguments.

I therefore will defer a final decision on the pending motion to dismiss and give Garcia 21 days to file an out-of-time response. The anticipated opposition must address all defenses raised in the motion to dismiss in a standalone filing that does not rely upon incorporation of factual and legal argument in Garcia's prior filings in this case (although previously-filed exhibits do not need to be refiled to be cited). In this regard, defenses that are claim-specific,

---

[7] The state supreme court held that the state district court did not abuse its discretion in denying a new trial based on the two party guest affidavits in part because a statement by Garcia during a recorded jailhouse conversation reflected that he knew about the witnesses before trial but chose not to tell either the investigating officers or defense counsel. ECF No. 16-6, at 4. The matter of whether evidence must be newly discovered or instead only newly presented for purposes of the *Schlup* actual innocence gateway is discussed briefly in note 2, *supra*.

[8] I also have the further option, in an egregious situation, of sanctions directed to the cause of the default (the attorney) rather than the petitioner relying on counsel. *Cf.* 18 U.S.C. § 3006A(c) (potential substitution). Repeated lapses of this general nature further may lead to a review of counsel's continued participation in the panel, although an isolated lapse by an otherwise competent attorney generally does not lead to such a review. No such action is warranted here, but the potential availability of case-specific or general action directed to appointed counsel in lieu of possible dismissal also informs my restraint in applying the local rule here. Counsel should endeavor, however, to review where the breakdown occurred that led to the current failure to timely respond to the motion.

such as exhaustion and non-cognizability, need to be responded to in the opposition on that claim-specific basis.[9] I advise Garcia and counsel that this will be the last opportunity to present factual and legal argument in opposition to the motion to dismiss based on the current record.[10]

I of course express no definitive opinion as to the ultimate resolution of any issue in the motion to dismiss. For the present, it suffices that the actual-innocence issue potentially is at least debatable. I determine here only that the interests of justice are best served at this juncture by not granting the motion to dismiss based solely upon Garcia's failure to timely oppose it.

If Garcia again completely fails to respond to the motion to dismiss without explanation, I do not rule out possible action pertaining to the particular panel appointment.

I THEREFORE ORDER that Garcia shall have **until May 21, 2021** to file an out-of-time response to the motion to dismiss (ECF No. 55). Motions to continue the out-of-time deadline are strongly discouraged and will be considered based on only the most compelling circumstances. The respondents' reply deadline will be as per the local rules.

Dated: April 28, 2021.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE

---

[9] Garcia did not at least directly respond on a claim-specific basis to all claim-specific defenses in the opposition to the earlier motion to dismiss. While some of the issues raised in the motion to dismiss apply across the board to all claims, that is not universally the case. I apply Local Rule 7-2(d) to issues raised within a motion. A failure to directly address a claim-specific argument in the opposition thus can lead to consent to a grant of the motion to dismiss to that extent. I will be applying specific defenses either across the board to the entire petition as amended or to specific claims. Garcia should respond to the motion to dismiss accordingly by clearly responding to claim-specific issues also on a claim-specific basis.

[10] As with prior orders, nothing in this order allowing an opportunity for an out-of-time response reflects any implied ruling with respect to tolling of the federal limitation period. *See* ECF No. 36, at 2 n.3.