UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| SALVADORE GARCIA,<br><br>           Petitioner,<br>    v.<br><br>BRIAN E. WILLIAMS, SR., et al.,<br><br>           Respondents. | Case No. 2:18-cv-01324-APG-VCF<br><br>**ORDER**<br><br>(ECF No. 55) |

Petitioner Salvadore Garcia, a Nevada state prisoner proceeding *pro se*, has filed a second amended petition for writ of habeas corpus (ECF No. 52) under 28 U.S.C. § 2254. The respondents move to dismiss. ECF No. 55.

**Background**[1]

Garcia challenges a 2006 conviction and sentence for attempted murder with the use of a deadly weapon, mayhem with the use of a deadly weapon, and destroying evidence. ECF No. 16-2. While at a party at Garcia's residence, 15-year-old Jonathan Harper sustained a gunshot wound to the head. Following trial and before sentencing, Garcia was appointed new counsel and filed a motion for new trial based on newly discovered evidence. ECF Nos 15-29, 15-30. The court denied Garcia's motion for new trial. ECF No. 16-1. Garcia was sentenced to 192 to 480 months for attempted murder with the use of a deadly weapon, a consecutive sentence of 48 to 144 months for mayhem with the use of a deadly weapon, and one year for destroying evidence. ECF No. 16-2.

Garcia appealed his conviction, and on October 11, 2007 the Supreme Court of Nevada affirmed. ECF Nos. 16-4, 16-6. On January 29, 2016, Garcia filed a *pro se* state habeas petition. ECF No. 16-8. The state district court appointed counsel and Garcia filed a supplemental state habeas petition. ECF No. 16-14. The state court dismissed the habeas petition. ECF No. 16-18.

---

[1] I make no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact. I summarize the factual assertions solely as background to the issues presented in the case, and I do not summarize all such material. No statement of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by me. Any absence of mention of a specific piece of evidence or category of evidence does not signify that I have overlooked the evidence in considering Garcia's claim.

Garcia appealed and the Nevada Court of Appeals affirmed the dismissal of the habeas petition, finding the petition procedurally barred under Nevada Revised Statutes (NRS) § 34.726(1). ECF No. 29-4.

On July 19, 2018, Garcia initiated this federal habeas proceeding. ECF No. 1. After appointment of counsel, Garcia filed a supplemental brief in support of his *pro se* federal petition. ECF Nos. 4, 13. I struck the supplemental brief and instructed Garcia to file an amended petition. ECF No. 36. Garcia filed an amended petition, and the respondents moved for a more definite statement. ECF Nos. 40, 44. I granted the motion and instructed Garcia to file a second amended petition. ECF No. 48.

Garcia filed his second amended petition. ECF No. 52. The respondents now move to dismiss the second amended petition as untimely. ECF No. 55. They further argue that Ground 1 is partially unexhausted and procedurally defaulted, Ground 2 is procedurally defaulted, Ground 4 is unexhausted, and that Ground 5 is not cognizable and unexhausted to the extent it is a stand-alone claim.[2] Garcia argues he is actually innocent as a means to avoid procedural bars in his case, including the statute of limitations. ECF No. 70.

**Discussion**

    **A. Timeliness**

The Antiterrorism and Effective Death Penalty Act (AEDPA) establishes a one-year limitation period for state prisoners to file a federal habeas petition under 28 U.S.C. § 2254. The one-year limitation period, *i.e.*, 365 days, begins to run from the latest of four possible triggering dates, with the most common being the date on which the petitioner's judgment of conviction becomes final by either the conclusion of direct appellate review or the expiration of the time for seeking such review. *Id.* § 2244(d)(1)(A). For a Nevada prisoner who pursues a direct appeal, his conviction becomes final when the 90-day period for filing a petition for certiorari in the United States Supreme Court expires after a Nevada appellate court enters

---

[2] Garcia has conceded that his claim of actual innocence alleged in Ground 5 "is not a free-standing claim, but merely a gateway to overcome potential procedural bars to his other claims." ECF No. 70 at fn 6.

judgment or the Supreme Court of Nevada denies discretionary review. *See Harris v. Carter*, 515 F.3d 1051, 1053 n.1 (9th Cir. 2008); *Shannon v. Newland*, 410 F.3d 1083, 1086 (9th Cir. 2005); Sup. Ct. R. 13.

Here, the Supreme Court of Nevada issued an order of affirmance on direct appeal on October 11, 2007. ECF No. 16-6. Thus, the time for Garcia to file a petition for certiorari expired on January 9, 2008. The AEDPA limitation period began running the following day. Absent any tolling or delayed accrual, the limitation period would have expired one year later, on January 10, 2009. Garcia's federal petition was filed over nine years later in July 2018.[3] The petition is therefore time-barred unless tolling applies. Garcia essentially concedes that the one-year limitation period expired long before he filed his federal petition. He argues that the court should excuse his failure to timely file because he is actually innocent. Garcia further argues that actual innocence excuses any procedural default and the exhaustion requirement.

**B. Actual Innocence**

Demonstrating actual innocence is a narrow "gateway" by which a petitioner can obtain federal court consideration of habeas claims that are otherwise procedurally barred, including claims filed after the expiration of the federal limitation period. *Schlup v. Delo*, 513 U.S. 298, 314–15 (1995); *Lee v. Lampert*, 653 F.3d 929, 932 (9th Cir. 2011) (en banc) (A "credible claim of actual innocence constitutes an equitable exception to AEDPA's limitations period, and a petitioner who makes such a showing may pass through the *Schlup* gateway and have his otherwise time-barred claims heard on the merits."); *see also McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). In this regard, "actual innocence" means actual factual innocence, not mere legal insufficiency. *See, e.g., Sawyer v. Whitley*, 505 U.S. 333, 339 (1992). "To be credible, [an actual innocence] claim requires petitioner to support his allegations of constitutional error with

---

[3] Garcia's state habeas petitions did not toll AEDPA's limitation period under 28 U.S.C. § 2244(d)(2) because the first state habeas petition was untimely under NRS § 34.726(1), which requires such petitions to be filed within one year of the date of the remittitur. *See Pace v. DiGuglielmo*, 544 U.S. 408, 412–16 (2005) (a state petition that violates the state statute of limitations is not "properly filed" for the purposes of § 2244(d)(2)). The remittitur from Garcia's direct appeal was entered in October 2007. ECF No. 18-36. He filed the state habeas petition in January 2016, more than seven years after the limitation period expired.

new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324. The narrow *Schlup* standard is satisfied only if the new, reliable evidence, together with the evidence adduced at trial, demonstrates that it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. *Id.* at 329.

"[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggen*, 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 329); *see also House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is "demanding" and seldom met).

When conducting a *Schlup* gateway review, a court "must 'assess how reasonable jurors would react to the overall, newly supplemented record,' including all the evidence the petitioner now proffers." *Stewart v. Cate*, 757 F.3d 929, 938 (9th Cir. 2014) (quoting *Lee*, 653 F.3d at 945). The court's "function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.* (quoting *House*, 547 U.S. at 538). In addition, the timing of the petition is a factor bearing on the "probable reliability of th[e] evidence" purporting to show actual innocence. *Schlup*, 513 U.S. at 332; *McQuiggin*, 569 U.S. at 400. "Delay is relevant if it is 'unexplained' or 'unjustified'." *Larsen v. Soto*, 742 F.3d 1083, 1095 (9th Cir. 2013) (quoting *McQuiggin*, 569 U.S. at 399 (internal alterations and brackets omitted)).

Garcia contends that he is actually innocent. He asserts that he submitted affidavits demonstrating his factual innocence following trial but was denied a new trial. ECF No. 70 at 8. Following trial, Garcia's newly appointed counsel hired an investigator who surveyed the crime scene and uncovered substantial evidence that undercuts the State's theory of the case. *Id*. The respondents argue that Garcia fails to meet the standard for passing through the actual innocence gateway when considering the evidence presented at trial in addition to the new evidence. ECF No. 73 at 6.

/ / / /

### a. Relevant Trial Evidence

At trial, the State presented evidence in support of its theory that Garcia shot Harper in the back of the head while Harper was seated at a dining table at Garcia's residence. ECF 15-23 at 36. The defense presented evidence at trial in support of the theory that Harper was holding the gun and accidentally shot himself. *Id*. at 37-39.

### i. Harper's Testimony

Individuals at the party, including Harper, were drinking alcohol, smoking marijuana, and taking Xanax. ECF No. 15-24 at 22. Harper testified that he was playing dominos at the dining table with three other people when he got into an argument with Garcia. *Id*. at 23. Garcia asked Harper to do a "mission," asking him to kill someone, and Harper refused. *Id.* Harper testified that Garcia pulled his gun, a .38 Ruby revolver, from his hip and pointed it at Harper. *Id*. at 24. Harper stated, "you're not going to shoot me so put it away," and Garcia put it away. *Id*. at 25. Garcia began walking towards the kitchen, pulled his gun out while he was walking, pointed it at Harper's head while Harper was seated and looking straight ahead, and shot Harper. *Id.*

Harper testified that he is right-handed. *Id*. at 26. On the night of the shooting, the index and middle fingers of Harper's left hand were injured from a fight. *Id*. at 26-27. He testified that he did not handle the gun that night and did not handle it with his left hand. *Id*. at 26. While Harper was in the hospital, upon questioning from a detective, Harper told the detective that he shot himself. *Id*. at 29. He testified that he told the detectives he shot himself because he was confused due to his brain injury. *Id*. Three weeks after the shooting, Harper told detectives that Garcia shot him. *Id*.

### ii. Neurosurgeon's Testimony

The State called Dr. Duke, the neurosurgeon that treated Harper for the gunshot wound. ECF No. 15-24 at 38. Dr. Duke testified that "[t]he entrance wound was just behind and above the left ear, and the exit wound was towards the vertex of the skull on the left side." *Id*. at 39. There was no stippling, gun powder residue, or soot on Harper's scalp. *Id*. Dr. Duke had treated hundreds of gunshot wounds, including approximately 100 self-inflicted gunshot wounds. *Id*. at 40. He opined that based on the trajectory of the bullet, it would be unusual for Harper's gunshot

wound to be self-inflicted, and that even for a left-handed person it would be extremely awkward and unusual for a self-inflicted gunshot wound to be in that trajectory. *Id*.

Dr. Duke testified that Harper was on multiple medications after his surgery. *Id*. at 45-46. He opined that he doubted that Harper could coherently carry on a conversation six days after brain surgery. *Id*. at 46

### iii. Testimony of Witnesses Present at the Party

At trial, the defense presented testimony from eight witnesses, including Garcia. Multiple witnesses testified that Harper had the gun before and after the gunshot and that Garcia came from a different room. Brian Calvillo was present at the party at Garcia's residence and testified that he was best friends with Harper. ECF No. 15-24 at 59. He further testified that he was sitting on a couch in the living room with another person when he heard a shot. *Id*. He got up and saw Harper with the gun in front of him with his head back. *Id*. He also observed Garcia running out of his bedroom. *Id*. at 60. Prior to the gunshot, he observed Harper picking up the gun, opening it, and looking at it. *Id*. at 61.

Arian Calvillo was also present at the party. ECF No. 15-24 at 66. He was at the table playing dominos. *Id*. at 67. He testified that Harper was playing with the gun, and while Arian was looking at his chips he heard a gunshot and saw Harper's head go back. *Id*. The gun dropped to Harper's lap. *Id*. Arian further testified that Garcia was in his bedroom at the time of the gunshot. *Id*. at 68.

Edshel Calvillo was present at the party. ECF No. 15-24 at 71. He testified that he observed Harper playing with the revolver, opening it, and taking bullets out of the gun. *Id*. at 72. He testified that Harper shot himself and that Garcia was next to Harper, to Harper's left. *Id*. at 72, 75. When Edshel first spoke to a detective, he stated that an individual named Casper owned the gun. *Id*. at 77. He later recanted and told the detective that Garcia had told him to say that Casper owned the gun. *Id*.

Melinda Lopez lived at Garcia's residence and is Garcia's girlfriend and the mother of his child. ECF No. 15-24 at 79. Lopez was asleep in the room and Garcia came into the room to talk to her. *Id*. A loud noise woke her up and she turned around and saw the door that automatically

closes to the room was starting to close. *Id*. After hearing a loud noise, she opened her door. She called 911 and informed them that someone shot himself. *Id*. at 80. She testified that someone named Juan told her that Harper shot himself. *Id*.

Chelsea Michael was present at the party. ECF No. 15-25 at 6. She was sitting on the couch when she heard a loud noise, stood up, and turned around. *Id*. As she was trying to leave the front door, she observed Garcia coming through the door back into the apartment. *Id*. at 7-8. She testified that she called Secret Witness to provide that there was no Casper. *Id*.

Manuel Lopez was present at the party. ECF No. 15-25 at 8. He was at the table playing dominos. *Id*. at 9. He testified that he saw Harper playing with the revolver at the table. *Id*. He was outside when he heard a shot, walked inside, and saw Harper laying there with the gun in his left hand. *Id*. at 10-12.

Juan Aguilar was present at the party. ECF No. 15-25 at 17-18. He was sitting on a couch in the living room when he heard a gunshot. *Id*. He turned around and saw people scattering around. *Id*. He saw Harper with his back against the wall and noticed that he was still breathing. *Id*. at 19. He went to Melinda's room and knocked on the door and told her to call 911. *Id*. He testified that he saw Harper playing with the gun earlier in the evening. *Id*.

Garcia testified he was at the dining table playing dominos and went into the bedroom to check on his girlfriend. ECF No. 15-25 at 22. He testified that he was in the bedroom for about four minutes when he heard a gunshot. When he came back out, he saw Harper laying back on the chair. *Id*. When he first spoke to detectives, he told them the gun belonged to Casper. *Id*. at 23. He told Edshel to tell the police the gun belonged to Casper. *Id*. at 24. On cross-examination, he testified that Chelsea saw him entering the apartment from the front door because he grabbed the gun and threw it under a car. *Id*. at 25.

### iv. Crime Scene Evidence

A crime scene analyst testified as to the condition of the apartment. ECF No. 15-24 at 13. She testified that she recovered three cartridges on the floor in the dining area and two cartridges on the seat of the chair. *Id*. at 15. There was blood on the south wall, blood on the floor, and a reddish-gray substance in the blood. *Id*. at 16. There was blood on the west wall where the chair

was and a few spots of blood on the ceiling. *Id*. In addition, there was biological matter on the base of a lamp and glass covering of the lamp. *Id*. There was also blood on the light fixture on the ceiling. *Id*. She further testified that she responded to the call as an attempted suicide. *Id*. at 17. She did not identify any staining on Garcia's clothing. *Id*. at 20.

### v. Bodily Evidence

The State called Dr. Kim, a trauma surgeon, that treated Harper. ECF No. 15-24 at 7. Dr. Kim testified that he did not note burn marks or powder burns for Harper's injury that he would have typically noticed for a self-inflicted gunshot wound. *Id*. at 9. The State also called Peter Shellberg, a crime scene analyst, who was dispatched to the hospital to photograph Harper. ECF No. 15-23 at 42. Shellberg did not see any stippling or powder burns on Harper's head. *Id*.

### b. New Evidence

In seeking to establish actual innocence under the *Schlup* standard, Garcia presents the following: (a) affidavits from two witnesses, Jasarae Jones and Kisha Horie, seeking to establish that Garcia was not in the kitchen at the time of the shooting and that Harper accidentally shot himself; (b) an affidavit by a posttrial defense investigator attesting that he recovered (1) what in his opinion were bullet fragments that had been embedded in the kitchen ceiling above where Harper was sitting, in locations consistent with the trajectory of a fragmenting bullet travelling upward through Harper's skull into the ceiling, and (2) a dried substance from the kitchen overhead light fixture that appeared to be brain matter or some type of bodily substance. ECF Nos. 52-36, 52-37, 52-38.

### i. Witness Affidavits

In her affidavit, Jones attests that she was present at Garcia's residence on the night of the shooting. ECF No. 52-38. She was sitting on the couch with a clear view of the kitchen and observed Harper sitting at the table against the wall. *Id*. Garcia was sitting at the table, but got up to go to the bedroom to see his girlfriend. *Id*. She observed Harper "messing with the gun" and the gun shot off. *Id*. She observed Harper with his head back and the gun in his left hand. *Id*. She was never interviewed by detectives. *Id*.

Horie attests in her affidavit that she was also present at Garcia's residence. ECF No. 52-

37. She was sitting on the couch next to Chelsea. *Id*. When the shot occurred, Garcia walked out of the bedroom. *Id*.

                      ii. **Investigator Affidavit**

Investigator Nordeen was retained by Garcia's posttrial counsel. He surveyed the crime scene and recovered bullet fragments embedded in the kitchen ceiling above where Harper was sitting. ECF No. 52-36 at 5. A dried substance that appeared to be brain matter or some type of bodily substance was recovered from the light fixture. *Id*. Nordeen set up a "dummy head" in the area where Harper was sitting and "[s]tring lines were run from four points of evidence recovered to a spot on the dummy head in the approximate location of the exit wound." *Id*. Nordeen "believes the shot to Harper[']s head could not have been fired from a downward angle to result in the fragments being lodged in the ceiling above the victim." *Id*. He further believes that "had a standing person shot at the sitting victim from the left side, and the bullet entered Harpers head behind the left ear, the bullet path would have been toward Harpers right jaw bone or right side of his face." *Id*. In his opinion, the bullet trajectory from the witness statements, the crime scene evaluation, and evidence recovery indicate an accidental discharge entering behind the left ear and exited at a point in the left parietal bone at the top of his head resulting in particles being deposited into the ceiling above Harper's location. *Id*.

                  **c. The Supreme Court of Nevada's Relevant Ruling on Direct Appeal**

On direct appeal, Garcia argued that the state district court should have granted him a new trial based on newly discovered evidence comprising of two new witnesses establishing that Garcia was not in the room when the victim was shot and physical evidence discovered at the crime scene. ECF No. 16-4 at 14. The Supreme Court of Nevada rejected this argument. ECF No. 16-6. "The State informed the district court that it had obtained a record of a jailhouse conversation between Garcia and his brother where they were discussing the motion for new trial and the two new witnesses, and Garcia stated, 'should have used them bitches the first time but I didn't want to get them involved.'" *Id*. at 4. The Supreme Court of Nevada found that Garcia therefore knew about the two witnesses and chose not to tell counsel or the investigating officers. *Id*. The district court found that the testimony of the new witnesses would have been cumulative

because the witnesses at trial also testified that Garcia was not present in the room where the shooting occurred. The Supreme Court of Nevada held that "the new proposed testimony would not have rendered a different result probably upon retrial." *Id*. at 4-5. As for the new physical evidence, the district court found that the proffered new evidence had "already been dealt with at trial." *Id*. at 5. The Supreme Court of Nevada further concluded that the evidence could have been discovered at any time prior to trial with the exercise of due diligence. *Id*.

### d. Garcia fails to meet the demanding *Schlup* standard.

Garcia has not made a convincing showing of actual innocence. He attempts to discredit the State's theory at trial based on newly discovered bullet fragments in the ceiling and Investigator Nordeen's opinion that "the shot to Harper's head could not have been fired from a downward angle to result in the fragments being lodged in the ceiling above the victim." ECF No. 52-36 at 5. The jury heard testimony at trial that there were blood spots on the ceiling above where Harper was sitting and blood on the ceiling light fixture. ECF No. 15-24 at 16. The defense highlighted the blood splatter on the ceiling, on the light fixture, and the lamp when presenting the theory that the bullet traveled straight upward from the gun in Harper's lap, through his skull, and the up toward the kitchen ceiling when he accidentally shot himself while playing with the gun with his injured fingers. ECF No. 15-25 at 36. The State presented a theory that the bullet travelled from Garcia's position behind Harper and through Harper's skull in a forward motion from behind his ear and out. *Id*. at 41. The State posited that Harper was positioned forward because he may have been ducking or slouched forward. *Id*. The neurosurgeon that operated on Harper determined there was no stippling, testified as to the trajectory of the bullet, and opined that it would be unusual for Harper's gunshot wound to be self-inflicted even if Harper was left-handed. *Id*. at 42. Although Garcia's new evidence may have bolstered his theory that Harper accidentally shot himself with his left hand while under the influence, the jury could have continued to believe that the prosecution witnesses' testimony was more accurate than that of the defense witnesses. I am not persuaded that the presentation of bullet fragments in the ceiling and an opinion as to the trajectory of the bullet demonstrates evidence so strong as to undermine the confidence in the jury's verdict.

As for the affidavits of the two new witnesses, Garcia asserts his innocence based on Horie and Jones attesting that Garcia was not in the same area as Harper until after the shot was fired. At trial, the defense presented at least four-to-five witnesses who testified that they observed Garcia come from his bedroom or another area after the gunshot. Although Edshel testified that Harper shot himself, he also testified that Garcia was next to Harper. Harper further testified that he saw Garcia behind him out of the corner of his eye. In addition, on cross-examination, the State elicited testimony that Garcia had told detectives that the gun belonged to an individual named Casper, which was not true, and Edshel testified that Garcia instructed him to refer to Casper as well. *See* ECF Nos. 15-24 at 77; 15-25 at 23-24. At closing, the jury heard the State highlight that the crime scene was tampered with because the gun was gone and the witnesses had left. The State also highlighted that Garcia told his friends to relay the Casper story to the police and similarly highlighted the witness credibility jury instruction. ECF No. 15-25 at 39. The affidavits of the two new witnesses are cumulative because they rehash other witnesses' testimony or are otherwise of minimal probative value considering the evidence already presented at trial. I cannot conclude that the evidence Garcia now proffers is "so strong" that we do not have "confidence in the outcome of the trial" such that "no reasonable juror would have found [Garcia] guilty." *Schlup*, 513 U.S. at 316.

I am not persuaded, in light of the new evidence, that no reasonable juror would have voted to find Garcia guilty beyond a reasonable doubt. Garcia fails to meet the demanding *Schlup* standard. I grant the respondents' motion to dismiss, and I dismiss Garcia's second amended petition as untimely.

I THEREFORE ORDER:

1. The respondents' Motion to Dismiss (**ECF No. 55**) **is GRANTED in part**. Garcia's second amended petition (ECF No. 52) is dismissed with prejudice as untimely.
2. A certificate of appealability is denied because reasonable jurists would not find my dismissal of the petition as untimely to be debatable or wrong, for the reasons discussed above.

/ / / /

3. The Clerk of Court is instructed to enter final judgment in favor of the respondents, dismissing this action with prejudice, and to close this case.

Dated: March 11, 2022.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE